Monica S. Call (11361)
mcall@foley.com
FOLEY & LARDNER LLP
95 South State Street, Suite 2500
Salt Lake City, UT 84111
(801) 401-8917

Martha Brewer Motley (*pro hac vice application forthcoming*)
mbmotley@vorys.com
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, OH  43215
(614) 464-5626
*Attorneys for Allergy Research Group LLC*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**CENTRAL DIVISION**

| | |
|---|---|
| ALLERGY RESEARCH GROUP LLC<br>a Delaware limited liability company,<br><br>        Plaintiff,<br><br>    v.<br><br>ARLI MUMUZIEV,<br><br>an individual<br><br>        And,<br><br>John Does, 1-10.<br><br>        Defendants. | Case No. 2:23-cv-00059<br><br>**COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 U.S.C. § 1114, 15 U.S.C. § 1125(a), AND RELATED CLAIMS** |

Plaintiff Allergy Research Group, a Delaware limited liability company ("Plaintiff" or "ARG"), brings this action against Defendants Arli Mumuziev and John Does 1-10 (collectively, "Defendants") for trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114; unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); common law trademark

infringement; deceptive trade practices in violation of Utah Code Ann. § 13-11a-3; unfair competition in violation of Utah Code Ann. § 13-5a-102; and tortious interference with contracts, and alleges as follows.  These claims arise from Defendants' misappropriation of ARG's trademarks in conjunction with Defendants' unlawful and unauthorized sale of non-genuine products bearing ARG's trademarks on the Internet.

## PARTIES, JURISDICTION, AND VENUE

1.      ARG is a Delaware limited liability company with its principal place of business in Salt Lake City, Utah.

2.      Upon information and belief, Defendant Mumuziev is a natural person who resides at 5118 NW 10th Avenue, Sunrise, Florida, 33177.

3.      Defendants operate a third-party storefront on www.amazon.com ("Amazon") that is currently called "TOKSTORE2" with Merchant ID A2GDSDXI9RQKIX. (the "Amazon Storefront").[1]  The Amazon Storefront lists a public "Business Name" of "Arli Mumuziev" and a public "Business Address" of "str.Pionerskaia 135, Tokmok city, 724910, KG."  Upon information and belief, this is not a valid street address in any country.

4.      ARG believes that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute. The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to ARG.  Therefore, ARG sues these defendants by the fictitious names John Does 1 through 10.  When the true names, involvement, and capacities

---

[1] The "TOKSTORE2" storefront is available here:  https://www.amazon.com/s?me=A2GDSDXI9RQKIX (last accessed 1/18/23).  The "TOKSTORE2" storefront was previously called "TV2-STORE."  Amazon allows storefront operators to change the names of their storefronts, but every storefront on Amazon is assigned a "Merchant ID number" that does not change over time.

of these parties are ascertained, ARG will seek leave to amend this Complaint accordingly.  If

ARG does not identify any such parties, it will dismiss these defendants from this action

## JURISDICTION

5.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§

1331, 1338, and 1367. Plaintiff's federal claims are predicated on 15 U.S.C. §§ 1114 and 1125(a)

and (c), and its claims arising under the laws of the State of Utah are substantially related to its

federal claims such that they form part of the same case or controversy under Article III of the

United States Constitution.

8.    This Court has personal jurisdiction over Defendants because they have expressly

aimed tortious activities toward the State of Utah and established sufficient minimum contacts with

Utah by, among other things, advertising, shipping, and selling infringing products bearing ARG's

trademarks to consumers within Utah through a highly interactive commercial website, through the

regular course of business, with knowledge that ARG is located in Utah and is harmed in Utah as a

result of Defendants' sales of infringing products to Utah residents.  Defendants know that ARG is

located in Utah, among other reasons, because they received cease-and-desist letters informing

them that ARG is located in Utah and is harmed in Utah by their unlawful actions.  ARG's claims

arise out of Defendants' substantial and regular sales of infringing products bearing ARG's

trademarks to Utah residents.

9.    Defendants have created an interactive storefront on Amazon called

"TOKSTORE2." Through this interactive storefront, Defendants actively advertise, market, sell,

ship, and distribute infringing products bearing ARG's trademarks in Utah and to Utah residents.

Defendants continue to engage in these actions despite being put on notice of their illegal conduct and the impendency of this action.

**VENUE**

10.     Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims herein occurred within this judicial district.

**FACTUAL ALLEGATIONS**
**ARG & Its Trademarks**

11.     ARG has been a leading developer of nutritional and dietary supplements for over forty years.

12.     Physicians and healthcare practitioners around the world depend on ARG for their patients' nutritional support.  Originating with the ground-breaking oxidant/antioxidant work of Stephen Levine, Ph.D., ARG was one of the first brands to introduce truly hypoallergenic products to the market.

13.     Since 1979, ARG has been trusted by consumers as a safety-conscious brand, and has implemented strict quality control procedures in every stage of production, including inspection of raw materials, manufacturing, packaging, and storing.  ARG is licensed by the State of Utah Department of Agriculture and Food, Certificate of Registration for Food Establishment number 190455 and US FDA registration number 19516500330.

14.     Nattokinase NSK-SD®, the first product containing the nattokinase enzyme that ARG introduced to the U.S. market, has established standardization and quality levels for all other nattokinase enzyme products.

4

15.    Additionally, ARG's glandular products are derived from government-inspected, range-fed animals, raised in New Zealand and Australia under the strictest government regulations. ARG's Tocomin SupraBio Tocotrienol products are 100% non-GMO, non-soy, Kosher and Halal certified from a pure palm mixed tocotrienol complex, obtained using sustainable agriculture from a founding member of the Roundtable on Sustainable Palm Oil (RSPO).

16.    ARG fully discloses all ingredients, both active and inactive, on every product label, so doctors can make fully informed choices for their patients' nutritional support.  ARG defines hypoallergenic as "free of all common allergens", specifically, wheat, corn, soy, gluten, yeast, dairy, eggs, fish, crustacean shellfish, tree nuts, and peanuts.  Many very sensitive individuals who react to supplements in general are able to tolerate ARG's products.

17.    ARG has consistently pioneered new breakthroughs in nutritional supplements. ARG's in-house Research and Development team has decades of experience in formulating original and leading-edge products to support optimal health.  Working with ARG's certified manufacturers, ARG continues to develop technologies that maximize product delivery, absorbency, and effectiveness, such as micronized particles and lipid matrix release.

18.    ARG makes products under the Allergy Research Group, NutraCology, and Optimox brands.

19.    ARG products are available exclusively through its website, https://www.allergyresearchgroup.com/, through websites for its various brands, such as https://www.nutricology.com/, and through distributors, resellers, and retailers who are expressly authorized by ARG to sell in their brick-and-mortar locations and/or on the Internet (distributors, resellers, and retailers hereafter "Authorized Sellers").

20.    ARG permits Authorized Sellers to sell ARG products in approved channels only and requires Authorized Sellers to abide by agreements, policies, and other rules that impose requirements relating to quality controls, customer service, and other sales practices (collectively, the "ARG Rules").

21.    ARG devotes a significant amount of time, energy, and resources toward protecting the value of its brand, products, name, and reputation.  By allowing end-user consumers to purchase ARG products exclusively from Authorized Sellers, who are required to follow ARG's quality controls and other requirements, ARG is able to ensure the safety, well-being, and satisfaction of consumers, and maintain the integrity and reputation of the ARG products.  In the highly-competitive nutritional and dietary supplement market, quality, safety, and customer service are a fundamental part of the consumer's decision to purchase a product.

22.    Genuine ARG products are packaged in a manner to ensure their safety and integrity, thereby allowing customers to receive only the undamaged, quality products that they expect from ARG.

23.    On the consumer side, ARG also offers its customers general and product-specific use instructions.

24.    On the distribution side, ARG's quality control consists of ensuring that its products are distributed only through ARG itself or through ARG's Authorized Sellers who must follow ARG's quality controls and are accountable to ARG for any quality issues.  By distributing products exclusively in this manner, ARG is better able to control the quality and integrity of its products and ensure that customers receive accurate information about them.

25.    To promote and protect its brands, ARG has registered numerous trademarks with

4895-7526-4844.1

the United States Patent and Trademark Office with respect to its brands and products, including, ALLERGY RESEARCH GROUP® (U.S. Trademark Registration No. 5,882,674), NUTRICOLOGY® (U.S. Trademark Registration No. 4,160,640), and OPTIMOX® (U.S. Trademark Registration No. 4,940,920) (collectively, the "ARG Registered Trademarks").

26.    The registration for each of the ARG Registered Trademarks is valid, subsisting, and in full force and effect.

27.    ARG actively uses and markets the ARG Registered Trademarks in commerce.

28.    Consumers recognize the ARG Registered Trademarks as being associated with ARG.

29.    Due to the quality and exclusive distribution of ARG's products, and because ARG is recognized as the source of high-quality products, the ARG Registered Trademarks have enormous value.

**Online Marketplaces and the Challenge They Present to ARG Product Quality**

30.    E-commerce retail sales have exploded over the past decade. From Q3 2012 to Q3 2022, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 5.5% to 14.8%. See Federal Reserve Bank of St. Louis, E-Commerce Retail Sales as a Percent of Total Sales (January 11, 2023), https://fred.stlouisfed.org/series/ECOMPCTSA#0.

31.    While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

32.    Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products

before purchasing them. Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the manufacturer.

33. Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller. As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

34. Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by authorized sellers. It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels. *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990. It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces. *See* Khadeeja Safdar et al., *You

*Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

35.    Third-party sellers on Amazon may also sell counterfeit items, or allow counterfeit items to enter the stream of commerce through poor controls, sourcing, and fulfillment practices.

36.    For example, the Department of Homeland Security published a report noting that online marketplaces can facilitate the sale of counterfeit goods and that "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods." Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), available at https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, at 7. The report stated that consumers on online marketplaces cannot rely on traditional "red flag" indicators of counterfeits and "have been surprised to discover that upon completion of an online sales transaction, that the order will be fulfilled by an unknown third-party seller." *Id.* at 14-15, 38. To mitigate these problems, the report recommended "[s]ignificantly enhanced vetting of third-party sellers." *Id.* at 35.

37.    The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine. *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016, https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019, https://www.washingtonpost.

9

com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/?arc404=true.

38.     The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue.  The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms.  The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online.  *See* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

39.     In its 2018 through 2021 annual reports to its shareholders, Amazon also admitted that third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers.  *See* Amazon.com, Inc., Annual Report (Form 10-K), at 14 (Jan. 31, 2019), *available at* https://www.sec.gov/Archives/edgar/data/1018724/000101872419000004/amzn-20181231x10k.htm; Amazon.com, Inc., Annual Report (Form 10-K), at 14-15 (Jan. 30, 2020), *available at* https://ir.aboutamazon.com/static-files/63a014ac-bd47-42ce-b548-022a90d96e9a;  Amazon.com, Inc., Annual Report (Form 10-K), at 8 (Feb. 2, 2021), available at

4895-7526-4844.1

https://www.sec.gov/Archives/edgar/data/1018724/000101872421000004/amzn-20201231.htm;

Amazon.com, Inc., Annual Report (Form 10-K), at 8 (Feb. 3, 2022), available at

https://www.sec.gov/Archives/edgar/data/1018724/000101872422000005/amzn-20211231.htm.

Amazon conceded that these actions are "violating the proprietary rights of others," and warned

its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

40.    Because brand owners have no relationship with or control over unauthorized

sellers, brand owners have no ability to exercise their quality controls over products sold by

unauthorized sellers or to ensure the products are safe and authentic.  A manufacturer's inability

to exercise control over the quality of its products presents serious risks to the safety of consumers.

41.    The structure, construction, and user interface of online marketplaces also pose

threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

42.    When purchasing products on an online marketplace, customers are not informed

whether a seller of a product is authorized by the manufacturer.  Additionally, the interface design

of many online marketplaces causes consumers to falsely believe that they are always purchasing

from the manufacturer or, at minimum, from an authorized seller that is selling under the

manufacturer's oversight and with the manufacturer's approval.  Consumers who purchase on

Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a

product are listed under a single product listing that states "By [name of brand]" or "Visit the

[name of brand] Store" immediately under the title of the product even though many products are

sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

43.     For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the manufacturer's quality controls.

44.     When a customer purchases a product on an online marketplace and receives a damaged, defective, or otherwise poor quality product, the customer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

45.     Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products—online product reviews.  Any consumer who is dissatisfied with the product received can post a review on the marketplace for all other consumers across the world to see.  These reviews, which are often permanently fixed, will often criticize the brand rather than the marketplace seller that sold the product.

46.     Online product reviews significantly impact a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

47.     Consumers place extraordinary trust in these online reviews.  Indeed, consumers are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by manufacturers.  *Moms Place Trust in Other Consumers*, EMARKETER, Feb. 10, 2010, https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.

48.     Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on

online marketplaces. Megan Henney, *FTC cracking down on fake Amazon reviews*, FOX BUSINESS, Feb. 28, 2019, https://www.foxbusiness .com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

49.     Reviews are especially impactful on online consumers. In a brick-and-mortar store, a consumer can simply select another product from the shelf if the initial product selected appears to be compromised. However, online consumers are left simply having to hope that the product that shows up on their doorstep is of appropriate quality. Therefore, online consumers rely more on brand reputation and reviews.

50.     Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings. According to one study, merely three negative online reviews will deter a majority (67%) of online consumers from purchasing a particular product. Graham Charlton, *How many bad reviews does it take to deter shoppers?*, ECONSULTANCY, April 11, 2011, https://econsultancy.com/blog/7403-how-many-bad-reviews-does-it-take-to-deter-shoppers.

51.     Negative reviews also hurt a brand's placement in search results on Amazon and other search engines, as Amazon's search algorithm downgrades products it believes consumers are less likely to buy. Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to search placement falling further.

**ARG's Reputation and Goodwill Have Been Harmed By Numerous Online Reviews Written By Consumers Who Purchased Poor-Quality Products From Unauthorized Sellers On Online Marketplaces**

52.     Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor-quality products and leave negative reviews on the product listing. These

13

negative reviews injure consumer perceptions of the brand's quality and reputation, as well as its placement in search results, ultimately causing the brand to suffer damage to its goodwill and lost sales.

53.      ARG has been a victim of the issues caused by unauthorized sellers on online marketplaces. Numerous consumers who purchased ARG products from unauthorized sellers, like Defendants, have written negative reviews where they complained of receiving products that were damaged, defective, discolored, or of otherwise poor quality.

54.      For example, many customers have complained of receiving ARG–branded products purchased on Amazon that are discolored and raised questions about authenticity:



55.    Several customer have also complained of receiving damaged products or products

apparently not subject to proper quality controls:





56.     The foregoing reviews are only a small sample of the negative reviews of ARG

products that have been posted on the Amazon platform.

57.     Amazon does not allow product reviews to identify the seller that sold the product

that is the subject of the product review.  Given that Defendants are selling a high volume of

products bearing the ARG Trademarks on Amazon and are not subject to ARG's quality controls,

however, it is likely that some of the foregoing negative reviews—and the many similar reviews

of ARG products that appear on the Amazon website—were written by customers who purchased

products bearing the ARG Trademarks from Defendants.

**ARG Has Implemented Quality Controls Throughout Its Authorized Channels of
Distribution to Combat the Problems Presented By Online Marketplaces, Protect the Value
of the ARG Trademarks, and Ensure Customers Receive the Genuine, High Quality
Products They Expect From ARG**

58.     The above reviews show how sales of poor-quality ARG products disappoint

ARG's consumers and cause significant harm to the reputation and goodwill of ARG and its family

of brands.  To protect itself and consumers from these harms, ARG implemented a quality control

program that applies to all of its Authorized Sellers, including sellers that sell in a brick-and-mortar

retail setting and sellers that sell online.

59.     ARG's distribution controls are a quality control measure intended to minimize the

risk and reputational damage caused by the illegal sale of poor-quality products bearing the ARG

Registered Trademarks by unauthorized sellers like Defendants who do not abide by ARG's

4895-7526-4844.1

quality controls.  The goal of ARG's quality control program is to ensure that consumers who buy ARG products, including ones buying online, receive products that feature all of the special characteristics that consumers expect from products sold under the ARG name, especially the quality and safety.  By preventing consumers from receiving poor-quality products, the program both protects consumers from confusion and also protects the value and goodwill associated with the ARG name.

60.    ARG abides by its quality control requirements and requires its Authorized Sellers to abide by them as well.

61.    ARG's ability to exercise its quality controls is essential to the integrity, safety, and quality of ARG products, as well as the value of the ARG Registered Trademarks and other intellectual property.

62.    ARG's quality controls begin with requiring that all outside sales of its products take place through ARG's own websites or through Authorized Sellers.  This basic step ensures that everyone who is selling ARG products is ultimately subject to ARG's quality control requirements.

63.    The ARG Rules limit to whom and where Authorized Sellers may sell ARG products.  To prevent persons outside of ARG's quality controls from acquiring and reselling ARG products, the ARG Rules prohibit Authorized Sellers from selling ARG products to any third party who is not an Authorized Seller and who intends to resell the products.  Authorized Sellers are permitted to sell ARG products only to end-user consumers or, in certain circumstances, to other Authorized Sellers.

4895-7526-4844.1

64.     In addition to restricting where and how Authorized Sellers can sell ARG products, the ARG Rules also require Authorized Sellers to follow numerous quality control requirements related to the inspection, handling, and storage of ARG products.

65.     ARG carefully vets prospective Authorized Sellers to ensure that only those applicants with a reputation for and a commitment to quality are permitted to become Authorized Sellers of ARG products.

66.     Among other conditions, the ARG Rules require Authorized Sellers to purchase ARG products only from ARG directly or authorized distributors approved by ARG.  This restriction ensures that the chain of custody can be established for all ARG products sold by Authorized Sellers, and thus prevents counterfeits, secondhand goods, or other low-quality products from entering into the distribution chain.  The ARG Rules also require Authorized Sellers to sell only to end users or to resellers approved by ARG, thus guarding against leaks in the chain of distribution.

67.     To ensure that customers receive the genuine and high-quality products they expect from ARG, the ARG Rules also require Authorized Sellers to inspect all shipments of ARG products for any damage, defects, evidence of tampering, and other non-conformance, remove all such products from inventory, and report any problems to ARG promptly.  Authorized Sellers are prohibited from selling damaged or defective products.

68.     The ARG Rules also require that Authorized Sellers store ARG products in accordance with guidelines issued by ARG.  This requirement helps ensure that ARG products are stored properly and are not damaged prior to being shipped to the consumer.

69.     To avoid consumer confusion and ensure that customers receive genuine ARG products, Authorized Sellers must sell ARG products in their original packaging and are prohibited from relabeling, repackaging, or altering ARG products or any accompanying label, literature, or safety-related information, unless instructed by ARG.

70.     Authorized Sellers are also prohibited from tampering with, defacing, or otherwise altering any identifying information on ARG products, including any serial number, UPC code, or other identifying information.

71.     The ARG Rules give ARG the right to monitor and audit Authorized Sellers by inspecting their facilities and records relating to ARG products, to ensure their compliance with ARG's quality control requirements.

72.     The ARG Rules also require Authorized Sellers to provide various customer services to their customers.

73.     For example, the ARG Rules require Authorized Sellers to be familiar with product-specific information, such as relevant expiration dates, and to be available to respond to customer questions and concerns both before and after the sale of ARG products. Furthermore, Authorized Sellers are required to assist with recalls and other consumer-safety information efforts. These requirements ensure that consumers get all the information they need and service they expect related to ARG products.

74.     Authorized Sellers are subject to auditing and review upon request by ARG to ensure that the ARG Rules are being followed.

75.     These restrictions are essential to ARG's ability to exercise its quality controls over ARG products because they prevent unauthorized sellers from obtaining and reselling ARG

19

products and allow ARG to know where all of its products are being sold online by Authorized Sellers. If a quality issue arises through an online sale, ARG can identify the Authorized Seller that made the sale, contact the Authorized Sellers, and address the issue immediately. ARG is unable to take such action against unauthorized sellers because it does not know who those sellers are and cannot obtain their cooperation in addressing any product quality issues that may arise.

76.     It is only by limiting authorized sales to Authorized Sellers who have access to, and are required to follow, the ARG Rules that ARG is able to ensure the satisfaction of consumers and to maintain the integrity and reputation of the ARG brand.

77.     ARG's quality control and customer service requirements are legitimate and substantial and have been implemented so that ARG can control the quality of goods manufactured and sold under the ARG Trademarks, to protect consumers as well as the value and goodwill associated with the ARG Trademarks.

78.     ARG's quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor quality and unsafe products. Consumers would find it material and relevant to their purchasing decision to know whether an ARG product that they were considering buying was being sold by an Authorized Seller who is subject to ARG's quality control and customer service requirements or whether the product is being sold by an unauthorized seller who is not subject to, and does not abide by, ARG's quality controls and over whom ARG is unable to exercise its quality controls.

4895-7526-4844.1

**Given the Flood of Poor Quality Products Being Sold Online and Consumers'**
**Inability to Inspect Such Products Before Purchase, ARG Imposes Additional**
**Requirements on Its Authorized Sellers Who Sell Online**

79.     As shown in consumer reviews cited above (¶¶ 52-57), ARG products sold online are more susceptible to quality and authenticity problems as consumers cannot see the products before they buy them.   These problems are especially severe on online marketplaces such as Amazon, where sellers can conceal the fact that they are unauthorized sellers and many sellers may share a single product listing page.

80.     Given these heightened risks to consumer satisfaction and the value of its trademarks that are posed by online sellers, ARG imposes additional quality control requirements on all of its Authorized Sellers who sell ARG products online, which are in addition to those that apply to all Authorized Sellers.

81.     The ARG Rules allow Authorized Sellers to sell ARG products on the Internet only through approved channels.   These rules allow ARG to oversee all Authorized Sellers who sell ARG products online.

82.     The ARG Rules specify that Authorized Sellers who are also authorized retailers are permitted to sell ARG products through their own proprietary websites ("Permissible Public Websites").  The ARG Rules provide certain minimum criteria that Authorized Sellers must adhere to when operating Permissible Public Websites, including that they must operate Permissible Public Websites in their own individual or legal names, they must provide mechanisms for customer feedback, and they must, for ARG product listings, only use images and product descriptions provided by ARG.  These requirements help ARG ensure product integrity and protect

the customer experience. Permissible Websites do not include storefronts on online marketplace websites like Amazon.

83.     ARG also allows certain of its authorized distributors to sell ARG products online through websites that require customers to create accounts to log-in and purchase products, subject to certain rules.

84.     ARG additionally authorizes certain of its authorized resellers to sell ARG products through ePharmacies operated by ARG's authorized distributors, subject to certain restrictions.

85.     ARG does not permit any other online sales of ARG products unless the seller has received ARG's written approval to sell on an Authorized Website. An "Authorized Website" is a website that ARG has specifically approved an Authorized Seller to use to sell ARG products. Authorized Sellers who do not meet the requirements for being able to sell on a Permissible Public Website (*i.e.*, those that are not authorized retailers) may sell ARG products online only through Authorized Websites.

86.     To submit a proposed Authorized Website for consideration by ARG, an Authorized Seller must submit an application that provides various items of information about its business and the website(s) where it wishes to sell ARG products. ARG vets its Authorized Sellers that submit applications as well as the websites proposed by these sellers to ensure that they meet ARG's criteria and will represent the ARG brand properly.

87.     For ARG to exercise its quality controls over products sold online, it must know what websites its Authorized Sellers are selling on and under what names. Accordingly, the ARG Rules prohibit Authorized Sellers from selling anonymously online and instead require them to state their business name and current contact information on all websites where they sell. This

requirement allows ARG and consumers of ARG products to address any quality issues or negative reviews that arise.  This requirement also allows ARG to protect the public from the sale of poor quality and counterfeit ARG products because it allows for easy detection of any Authorized Seller that sells poor quality or inauthentic goods.

88.    Authorized Sellers that sell ARG products on Permissible Websites or Authorized Websites ("Authorized Online Sellers") must also adhere to additional requirements under the ARG Rules.

89.    For example, Authorized Online Sellers must use images of ARG products provided or approved by ARG and keep product descriptions up to date.

90.    The ARG Rules prohibit Authorized Online Sellers from selling anonymously and instead require them to state their business name and current contact information on all websites where they sell, while not giving any appearance that the website is operated by ARG or another third party.  These requirements allow consumers of ARG products to understand the nature of the seller from they are purchasing and contact the seller if any quality issues arise.  These requirements also allow ARG to protect the public from the sale of poor quality and counterfeit ARG products because it allows for easy detection of any Authorized Online Seller that sells poor quality or counterfeit goods.  In addition, Authorized Sellers who are approved to sell on Authorized Websites may sell ARG products only on the websites and under the name(s) specifically approved by ARG.

91.    At ARG's request, Authorized Online Sellers must provide access to and copies of all web pages that make up any Permissible Website or Authorized Website where Authorized Online Sellers are selling ARG products.

92.     Authorized Online Sellers are prohibited from representing or advertising any ARG product as "new" that has been returned, repackaged, or otherwise been altered by a customer. When customers return products that were purchased online, many websites and online marketplaces will, by default, repackage the products and allow them to be relisted as "new."  The ARG Rules prohibit Authorized Online Sellers from allowing or carrying out this practice, to ensure that customers receive the high-quality ARG products that customers expect when they purchase "new" products.

93.     Unless otherwise approved by ARG, Authorized Online Sellers may not use any third-party fulfillment service to store inventory or fulfill orders for ARG products.  Authorized Online Sellers are also prohibited from using any fulfillment or storage service that could cause or allow customers to receive ARG products from other sellers' product stock when they purchase from Authorized Online Sellers.  These requirements ensure that the specific products that the Authorized Online Seller has that meet ARG's quality standards will be those that are shipped to the customer in fulfillment of an order, rather than other products that are outside of ARG's quality controls.

94.     All websites through which Authorized Online Sellers sell ARG products must comply with all applicable data security, accessibility, and privacy requirements.

95.     Authorized Websites and Permissible Public Websites must have a mechanism for receiving customer feedback, and Authorized Online Sellers must take appropriate steps to address any feedback received.  Authorized Sellers must also: (i) keep copies of all information related to customer feedback regarding ARG products and Authorized Sellers' responses; (ii) provide this

information to ARG upon request; and (iii) cooperate with ARG in investigating negative online reviews related to sales of ARG products.

96.     The additional quality-control requirements that ARG imposes on its Authorized Online Sellers are legitimate and substantial and have been implemented to allow ARG to carefully control the quality of ARG products that are sold on the Internet and address any quality issues that arise.

97.     ARG's additional quality controls for online sales are also material, as they have been implemented to ensure that consumers who purchase ARG products on the Internet receive genuine, high-quality ARG products that abide by ARG's quality controls.  Consumers purchasing ARG products on the Internet would find it relevant to their purchasing decision to know whether the product they are buying is vended by an Authorized Online Seller who is subject to, and abides by, ARG's quality controls.

**ARG Monitors and Audits Its Authorized Sellers to Ensure They Comply with ARG's Quality-Control Requirements**

98.     ARG also regularly monitors and audits its Authorized Online Sellers, to ensure that these sellers and their websites are complying with ARG's quality-control requirements.  ARG carries out these auditing and monitoring actions pursuant to an internal program called the ARG Online Quality Control Auditing Program ("Auditing Program").

99.     Under the Auditing Program, ARG periodically conducts test purchases of ARG products from the Authorized Websites and Permissible Websites.  If ARG discovers any quality problems in purchased products or discovers that an Authorized Online Seller is otherwise not following the quality control requirements that Authorized Online Sellers must follow when selling on Authorized Websites or Permissible Websites—for example, by altering product

packaging or fulfilling product orders through an unapproved third-party fulfillment service—ARG communicates with the responsible Authorized Online Seller and takes any necessary corrective action.

### Genuine ARG Products Come with ARG's Satisfaction Guarantee; Defendants' Products Do Not

100.    ARG also provides customers who purchase genuine ARG products from ARG itself or Authorized Sellers the ARG Satisfaction Guarantee (the "Satisfaction Guarantee").

101.    The Satisfaction Guarantee allows a customer who is dissatisfied with an ARG product to request a replacement product or refund within 60 days of their original purchase. *See Allergy Research Group LLC 60-Day Satisfaction Guarantee, available at* https://www.allergyresearchgroup.com/guarantee. Such statements are incorporated herein.

102.    As discussed above, ARG cannot ensure the quality of the products sold by unauthorized sellers, like Defendants, who are not subject to ARG's quality controls. For this reason, the ARG Satisfaction Guarantee does not cover ARG products sold by unauthorized sellers, like Defendants, who do not comply with ARG's quality controls and standards. Indeed, the Satisfaction Guarantee specifically states: "not available for products purchased from unauthorized sellers."

103.    The ARG Satisfaction Guarantee is a material component of genuine ARG products. Consumers who purchase ARG products with the ARG Satisfaction Guarantee receive the peace of mind that they are receiving a good quality product, that ARG stands behind the product, and that if a defect occurs, they will have the ability to get a refund or a replacement.

104.    Consumers would find it material and relevant to their purchasing decision to know whether an ARG product they were considering buying was covered by the ARG Satisfaction

26

Guarantee. If a consumer knew a product did not come with the ARG Satisfaction Guarantee, the consumer would be less likely to purchase the product.

**Defendants Are Aware of Online Marketplaces and the Policies That Companies Adopt Around Online Marketplaces**

105. Due to the risks to consumers and the reputational concerns associated with the illegal sale of products bearing the ARG Trademarks by unauthorized Internet sellers, ARG polices the sale of its products online.

106. In the course of monitoring online listings of ARG products, ARG discovered a high volume of products bearing the ARG Registered Trademarks being illegally sold by Defendants on Amazon under the storefront name "TOKSTORE2" in or about August 2022.

107. After ARG discovered products bearing the ARG Registered Trademarks being illegally sold on the Amazon storefront, ARG investigated the storefront to determine who was operating the storefront.

108. ARG identified Defendants as the owners and operators of the "TOKSTORE2" Amazon storefront.

109. Defendants are not Authorized Sellers.

110. Upon information and belief, the "TOKSTORE2" storefront regularly accepts and fulfills orders from Utah residents for infringing products bearing the ARG Trademarks and ships those products to persons in Utah.

111. Furthermore, the "TOKSTORE2" storefront offers products for sale as "Fulfilled by Amazon," often referred to as "FBA."

112. The FBA service requires Defendants to ship their products to Amazon's warehouses and, if and when sold, the products are shipped by Amazon to the buyer. Amazon does

27

not contact sellers for approval of the purchase.  Defendants retain ownership of the products they store at Amazon warehouses until they are purchased by consumers.

113.    By selling items FBA, Defendants agreed to have their products stored across the United States, including in any one of the multiple Amazon fulfillment centers in Utah.  *See* Becky Jacobs, *See inside a giant Amazon center in Salt Lake City as company continues to grow in Utah*, THE SALT LAKE TRIBUNE (Nov. 4, 2021).[2]



114.    Defendants' high-volume of Amazon sales and the foregoing fraud give ARG reason to believe that Defendants are and were selling ARG-branded products obtained from unauthorized sellers on its Amazon storefront.

---

[2] Available at:  https://www.sltrib.com/news/2021/11/04/see-inside-giant-amazon/#:~:text=Amazon%20now%20has%2016%20facilities,opening%20in%202022%2C%20spokesperson%20says (last accessed 1/20/23).

4895-7526-4844.1

**Defendants Are Not Authorized Sellers And Are Illegally Selling Non-Genuine Products Bearing The ARG Trademarks**

115.    On or about August 10, 2022, counsel for ARG sent Defendants a cease-and-desist letter, demanding that they immediately cease selling products bearing the ARG Registered Trademarks.

116.    This letter further notified Defendants that they were injuring ARG in Utah through their illegal actions and that they would be subject to personal jurisdiction in Utah if they continued to engage in their conduct.

117.    This letter also notified Defendants that ARG had contracts with its Authorized Sellers that restrict sales to end-user consumers through approved channels or resellers who meet certain requirements as dictated by ARG, and that Defendants would be tortiously interfering with those contracts if they continued to purchase products bearing the ARG Registered Trademarks from Authorized Sellers for resale outside of ARG's established distribution channels.

118.    Defendants did not respond to this letter and continued to sell products bearing the ARG Registered Trademarks on the "TOKSTORE2" storefront.

119.    Counsel for ARG sent Defendants a second cease-and-desist letter on or about August 17, 2022.

120.    Defendants did not respond to this second cease-and-desist letter.

121.    Counsel for ARG sent Defendants a third letter on September 6, 2022 via email at arliarli9696@gmail.com and tabaldiev.ataii96@gmail.com.

122.    Defendants did not respond to this third letter.

123.    Counsel for ARG sent Defendants a fourth letter on September 28, 2022 via email at arliarli9696@gmail.com and tabaldiev.ataii96@gmail.com.

124.    Defendants did not respond to this fourth letter.

125.    As part of ARG's investigation, it issued a subpoena to Amazon.com in an earlier filed case for information related to the owners and operators of "TOKSTORE2." Amazon's subpoena revealed the email addresses arliarli9696@gmail.com and tabaldiev.ataii96@gmail.com. The subpoena also revealed an address of "Warehouse 5118 NW 10th Avenue, Sunrise, FL, 33177, US."

126.    ARG also performed a product test buy to determine where the Defendants are located, and that test buy confirmed the address "Warehouse 5118 NW 10th Avenue, Sunrise, FL, 33177, US."

127.    In response to the subpoena, Amazon also produced an address of "str.Pionerskaya 135  Tokmok city, 724910, KG," the same address as is publicly displayed on the "TOKSTORE2" storefront, which is also, upon information and belief and based on ARG's investigation, not a valid street address in any country.

128.    As a last step to avoid litigation, ARG's counsel again reached out to Defendants by email in January 2023 at the above listed email addresses, cautioning that ARG was prepared to litigate and asking for the address where Defendants could receive service of process. Defendants did not respond.

129.    As of the time of filing, Defendants have not responded to any of ARG's letters and continue to advertise and sell products bearing the ARG Trademarks through their "TOKSTORE2" Amazon storefront.

130.    Through their highly interactive "TOKSTORE2" storefront on Amazon, Defendants have sold products bearing the ARG Trademarks to residents of Utah through the regular course of business.

131.    Defendants' disregard of ARG's cease-and-desist letters and continued sale of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

**Defendants' Are Not Subject To, Do Not Abide By, and Interfere with ARG's Quality Control Requirements**

132.    Defendants are not Authorized Sellers of ARG products, and do not abide by ARG's quality control and customer service requirements that ARG requires Authorized Sellers to follow.

133.    Defendants directly violate ARG's quality controls, among many other ways, by failing to completely and accurately identify themselves on their online storefront.  Defendants do not public display their real business name, any email or physical address, or even any telephone number on their Amazon Storefront.

134.    Defendants also do not comply with ARG's quality controls and interfere with ARG's quality controls because ARG is unable to audit Defendants' practices.  Therefore, among other things, ARG cannot know if Defendants are sourcing products from reliable sources, inspecting products upon receipt, avoiding risky fulfillment practices such as commingling, ensuring that products are sold only in official and unaltered ARG packaging, or providing good customer service.  Defendants' practices thus risk introducing counterfeit and other non-genuine products bearing the ARG Registered Trademarks into the stream of commerce.

4895-7526-4844.1

135.    Defendants' failure to abide by the ARG Rules prevents ARG from exercising control over the quality of products Defendants sell bearing the ARG Trademarks.  Unlike with its Authorized Online Sellers, ARG cannot monitor or audit Defendants to ensure they are complying with its quality controls or take any action to correct quality problems it discovers or is alerted to in products sold by Defendants.

136.    Because the products Defendants sell bearing the ARG Trademarks are not subject to, do not abide by, and interfere with ARG's quality control and customer service requirements, they are not genuine ARG products.

### Defendants Are Selling Defective, Damaged, Previously Used, and Other Poor-Quality Products Through Their Amazon Storefront

137.    Consumers on Amazon can leave reviews of sellers as well as products.  Reviews of Defendants' "TOKSTORE2" Amazon Storefront show that Defendants have sold numerous poor-quality products to consumers that were damaged, incorrect, unsafe, and not held to ARG's quality controls regarding storage, as shown in the screenshots below:

★☆☆☆☆    "You did not send me the right product. I ordered Nattokinase 100 mg 60 tablets, but you sent me Pregnenolone 100 mg 60 tablets. Please reimburse my account. I need to return this unopened manufacture sealed wrong product. "

Read less

By Jude on September 28, 2022.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆    "You charge me for a 180 count bottle and I only received a 60 count bottle. "

By Mobedog2020 on July 13, 2022.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

★☆☆☆☆     "~~The product was probably fine when it left the company. It clearly states on the bottle to store in a COOL~~
~~dry place. It was derived to me in 100 degree temperature!! The package and the bottle was HOT when I~~
~~received it from the hands of the deliverer's hands. I'm not sure if the product is safe or if the same~~
~~quality now that it has been through such high heat. Safety of product quality #1~~ "
Read less

By Wanda on June 23, 2022.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

138.    These seller reviews are evidence that Defendants ship products bearing the ARG Trademarks that are poor-quality.  Many consumers who receive such products from Defendants and other unauthorized sellers may leave poor reviews of ARG products rather than Defendants' seller performance (*see supra* ¶¶ 52-57), or become less likely to buy and recommend ARG products in the future because they have attributed these quality problems to ARG.

139.    Although Amazon has stated that it takes "responsibility" for the "fulfillment experiences" described in the complaints, the problems that customers address in these reviews are clearly the fault of Defendants rather than a fulfillment problem, such as delivering a product to the wrong address, that could be attributable to Amazon rather than Defendants.

**Defendants' Products Do Not Come With the Satisfaction Guarantee**

140.    As set forth above, genuine ARG products purchased from ARG or Authorized Sellers come with the Satisfaction Guarantee because they comply with ARG's quality controls, and this Satisfaction Guarantee is a material part of what consumers expect when they purchase ARG products.

141.    Because Defendants are not Authorized Sellers of ARG products and do not comply with ARG's quality controls, the products they sell bearing the ARG Registered Trademarks do not come with the Satisfaction Guarantee.

142.    Because the products Defendants sell do not come with the Satisfaction Guarantee, they are materially different from genuine ARG products.

143.    Defendants' unauthorized sale of non-genuine products bearing the ARG Registered Trademarks but without the Satisfaction Guarantee is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine ARG Products that come with the Satisfaction Guarantee when, in fact, they are not.

**Defendants Are Tortiously Interfering With
ARG's Agreements With Its Authorized Sellers**

144.    Upon information and belief, Defendants have purchased ARG products from ARG Authorized Sellers for purposes of unlawfully infringing upon and materially damaging the value of the ARG Registered Trademarks by reselling the products on the Internet outside of ARG's quality controls.

145.    ARG's agreements with its Authorized Sellers prohibit Authorized Sellers from selling ARG products to third parties, like Defendants, who are not Authorized Sellers and who intend to resell the products.

146.    Defendants have known of this prohibition since August 10, 2022.  On that date, ARG mailed a cease-and-desist letter to Defendants explaining that ARG has agreements with all of its Authorized Sellers that prohibit them from selling ARG products to any person or entity that is not an Authorized Seller and intends to resell the products.

147.    ARG's letter also informed Defendants that, by purchasing ARG products from an Authorized Seller for the purpose of reselling them, they were causing a breach of the agreement

between ARG and its Authorized Sellers and were interfering with ARG's agreements and business relationships.

148.    ARG's August 10, 2022, letter also advised Defendants that if they continued to acquire products from ARG's Authorized Sellers and then resold the products, they would be liable for tortiously interfering with ARG's contracts and business relationships with its Authorized Sellers.

149.    Despite being provided this information, upon information and belief, Defendants have continued to acquire ARG products from ARG's Authorized Sellers and then resold the products.

150.    Upon information and belief, Defendants do not disclose to Authorized Sellers that they intend to resell the products they purchase from Authorized Sellers.

151.    Upon information and belief, Defendants willfully and knowingly induced, and are continuing to induce, unknown Authorized Sellers to breach their agreements with ARG so that they can acquire ARG products and unlawfully infringe upon the ARG Trademarks by reselling the products.

**ARG Has Suffered Substantial Harm as a Result of Defendants' Conduct**

152.    As set forth above, the unauthorized sale of products bearing the ARG Registered Trademarks through unauthorized sellers such as Defendants has caused significant harm to the ARG brands.

153.    When a consumer receives a non-genuine, damaged, or poor-quality product from an unauthorized seller, such as Defendants, the consumer associates that negative experience with

ARG. As such, Defendants' ongoing sale of non-genuine products bearing the ARG Registered Trademarks harms the ARG brand.

154.    ARG has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

155.    ARG has suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

156.    ARG is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell non-genuine products bearing the ARG Registered Trademarks, causing continued irreparable harm to ARG's reputation, goodwill, relationships, intellectual property, and brand integrity.

157.    Furthermore, Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton, and contrary to law.

158.    Defendants' disregard of communications from ARG and continuation of selling of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

159.    Defendants' willful violations of the ARG Registered Trademarks and continued pattern of misconduct demonstrate intent to harm ARG.

**FIRST CAUSE OF ACTION**
**Trademark Infringement**
**15 U.S.C. §§ 1114 and 1125(a)(1)(A)**

160.    ARG hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

161.    ARG is the owner of the ARG Registered Trademarks.

162.    ARG has registered the ARG Registered Trademarks with the United States Patent and Trademark Office.

163.    The ARG Registered Trademarks are valid and subsisting trademarks in full force and effect.

164.    Defendants willfully and knowingly used, and continue to use, the ARG Registered Trademarks in commerce for purposes of selling non-genuine products bearing the ARG Registered Trademarks on the Internet without ARG's consent.

165.    The products Defendants sell bearing the ARG Registered Trademarks are not authorized for sale by ARG.

166.    The products Defendants sell bearing the ARG Registered Trademarks are materially different from genuine ARG products because they are not subject to, do not abide by, and interfere with the legitimate and substantial quality controls that ARG has established.

167.    The products Defendants sell bearing the ARG Registered Trademarks are materially different from genuine ARG products because they do not come with the Satisfaction Guarantee, which accompanies genuine ARG products.

168.    Defendants' unauthorized sale of materially different products bearing the ARG Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers because

it suggests that the products Defendants offer for sale are genuine ARG products when they are not.

169.   Defendants' unauthorized sale of materially different products bearing the ARG Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with ARG when, in fact, they are not.

170.   Defendants' unauthorized use of the ARG Registered Trademarks has infringed upon and materially damaged the value of the ARG Registered Trademarks, and caused significant damage to ARG's business relationships.

171.   As a proximate result of Defendants' actions, ARG has suffered, and will continue to suffer, immediate and irreparable harm.  ARG has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

172.   ARG is entitled to recover its damages caused by Defendants' infringement of the ARG Registered Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

173.   ARG is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, ARG will suffer irreparable harm.

174.   ARG is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the ARG Registered Trademarks.

## SECOND CAUSE OF ACTION
### Unfair Competition
### 15 U.S.C. § 1125(a)

175.    ARG hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

176.    As set forth above, Defendants are selling non-genuine products bearing the ARG Registered Trademarks that are materially different from genuine ARG products.

177.    Defendants' sale of non-genuine products bearing the ARG Registered Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by ARG when they are not.

178.    Defendants' conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a).

179.    ARG is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, ARG will suffer irreparable harm.

180.    ARG is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the ARG Registered Trademarks.

## THIRD CAUSE OF ACTION
### Common Law Unfair Competition

181.    ARG hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

4895-7526-4844.1

182.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the ARG Registered Trademarks interferes with ARG's quality controls and its ability to exercise quality control over products bearing the ARG Registered Trademarks.

183.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the ARG Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the ARG Registered Trademarks suggests that the products Defendants offer for sale are subject to, and abide by, ARG's quality controls when, in fact, they are not.

184.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the ARG Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the ARG Registered Trademarks suggests that the products Defendants offer for sale are genuine ARG products when, in fact, they are not.

185.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the ARG Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the ARG Registered Trademarks suggests that the products Defendants offer for sale are sponsored by, authorized by, or otherwise connected with ARG when, in fact, they are not.

186.    Defendants' unlawful actions constitute active misrepresentation as to the source of the products they sell.  These false representations tend to confuse customers and induce them to believe that Defendants' products are genuine ARG products when, in fact, they are not.

187.    Defendants' unauthorized sale of products bearing the ARG Registered Trademarks, and unauthorized use of the ARG Registered Trademarks in advertising, infringes the ARG Registered Trademarks and constitutes unfair competition at common law.

4895-7526-4844.1

188.    Defendants' unauthorized use of the ARG Registered Trademarks has materially damaged the value of the ARG Registered Trademarks, caused significant damage to ARG's business relations, and infringed the ARG Registered Trademarks.

189.    As a result, ARG has suffered, and continues to suffer, immediate and irreparable harm.  ARG has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

190.    ARG is also entitled to punitive damages because Defendants acted with actual malice accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

### FOURTH CAUSE OF ACTION
**Deceptive Trade Practices**
**Utah Code Ann. § 13-11a-3**

191.    ARG hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

192.    This claim arises under the laws of the State of Utah.

193.    ARG is the owner of the ARG Registered Trademarks.

194.    ARG has registered the ARG Registered Trademarks with the United States Patent and Trademark Office.

195.    The ARG Registered Trademarks are valid and subsisting trademarks in full force and effect.

196.    Defendants willfully and knowingly used, and continue to use, the ARG Registered Trademarks in interstate commerce, including through their product listings on Amazon, for

41

purposes of advertising, promoting, and selling ARG products on the Internet without ARG's consent.

197.    Defendants' advertisements and promotions of products unlawfully using the ARG Registered Trademarks have been disseminated to the relevant purchasing public.

198.    The products Defendants advertise and sell bearing the ARG Registered Trademarks are not authorized for sale by ARG.

199.    ARG has established legitimate, substantial, and non-pretextual quality control procedures over ARG products.

200.    ARG abides by these quality control procedures and requires all of its Authorized Sellers to abide by these quality controls.

201.    ARG's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them.  When a consumer is deciding whether to purchase a product bearing the ARG Registered Trademarks, whether the product is subject to and abides by ARG's quality controls would be relevant to the consumers' purchasing decision.

202.    The products Defendants advertise, promote, and sell bearing the ARG Registered Trademarks are not subject to, do not abide by, and interfere with ARG's quality controls and customer service requirements.

203.    The products Defendants advertise, promote, and sell bearing the ARG Registered Trademarks do not come with the Satisfaction Guarantee.

204.    Because the products Defendants advertise and sell bearing the ARG Registered Trademarks are not subject to, do not abide by, and interfere with ARG's quality controls and

4895-7526-4844.1

customer service requirements, and do not come with the Satisfaction Guarantee, the products Defendants sell are materially different from genuine ARG products.

205.    Because the products Defendants advertise and sell bearing the ARG Registered Trademarks are not subject to, do not abide by, and interfere with ARG's quality controls and customer service requirements, and do not come with the Satisfaction Guarantee, the products Defendants sell are not genuine ARG products.

206.    Defendants' unauthorized sale of products bearing the ARG Registered Trademarks interferes with ARG's quality controls and ability to exercise quality control over products bearing the ARG Registered Trademarks.

207.    Defendants' use of the ARG Registered Trademarks in connection with the unauthorized sale and advertising of products is likely to cause confusion, cause mistake, or deceive an appreciable number of ordinarily prudent purchasers as to the affiliation, connection, association, sponsorship or approval of ARG products because it suggests that the products Defendants offer for sale originate from, or are sponsored, authorized, approved, or otherwise connected with ARG when, in fact, they are not.

208.    Defendants' unauthorized sale of products bearing the ARG Registered Trademarks, and unauthorized use of the ARG Registered Trademarks in advertising constitute deceptive trade practices under Utah Code Ann. § 13-11a-3.

209.    Defendants' unauthorized sale of products bearing the ARG Registered Trademarks, and unauthorized use of the ARG Registered Trademarks in advertising, materially damages the value of the ARG Registered Trademarks and causes significant damages to ARG's business relations.

4895-7526-4844.1

210.    As a result of Defendants' unlawful actions, ARG has suffered, and continues to suffer, immediate and irreparable harm.  ARG has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

211.    Pursuant to Utah Code Ann. § 13-11a-4(2), ARG is entitled to injunctive relief enjoining Defendants' infringing conduct, as well as damages, and attorneys' fees and costs.

212.    ARG is also entitled to punitive damages because Defendants acted willfully and maliciously toward ARG or with knowing or reckless indifference toward, and disregard of, the rights of ARG.

### FIFTH CAUSE OF ACTION
**Unfair Competition**
**Utah Code Ann. § 13-5a-102**

213.    ARG hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

214.    This claim arises under the laws of the State of Utah.

215.    ARG is the owner of the ARG Registered Trademarks.

216.    ARG has registered the ARG Registered Trademarks with the United States Patent and Trademark Office.

217.    The ARG Registered Trademarks are valid and subsisting trademarks in full force and effect.

218.    Defendants willfully and knowingly used, and continue to use, the ARG Registered Trademarks in interstate commerce, including through their product listings on Amazon, for the

purpose of advertising, promoting, and selling products bearing the ARG Registered Trademarks without the consent of ARG.

219.    Defendants' advertisements and promotions of products unlawfully using the ARG Registered Trademarks have been disseminated to the relevant purchasing public.

220.    The products Defendants advertise and sell bearing the ARG Registered Trademarks are not authorized for sale by ARG.

221.    ARG has established legitimate, substantial, and non-pretextual quality control procedures over ARG products.

222.    ARG abides by these quality control procedures and requires all of its Authorized Sellers to abide by these quality controls.

223.    The products Defendants advertise, promote, and sell are not genuine ARG products because the products are not authorized for sale by ARG and are materially different from genuine ARG products.

224.    ARG's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them.  When a consumer is deciding whether to purchase a product bearing the ARG Registered Trademarks, whether the product is subject to and abides by ARG's quality controls would be relevant to the consumers' purchasing decision.

225.    The products Defendants advertise, promote, and sell bearing the ARG Registered Trademarks are not subject to, do not abide by, and interfere with ARG's quality controls and customer service requirements.

226.    The products Defendants advertise, promote, and sell bearing the ARG Registered Trademarks do not come with the Satisfaction Guarantee.

4895-7526-4844.1

227.    Because the products Defendants advertise and sell bearing the ARG Registered Trademarks are not subject to, do not abide by, and interfere with ARG's quality controls and customer service requirements, and do not come with the Satisfaction Guarantee, the products Defendants sell are materially different from genuine ARG products.

228.    Because the products Defendants advertise and sell bearing the ARG Registered Trademarks are not subject to, do not abide by, and interfere with ARG's quality controls and customer service requirements, and do not come with the Satisfaction Guarantee, the products Defendants sell are not genuine ARG products.

229.    Defendants' unauthorized sale of products bearing the ARG Registered Trademarks interferes with ARG's quality controls and ability to exercise quality control over products bearing the ARG Registered Trademarks.

230.    Defendants' use of the ARG Registered Trademarks in connection with the unauthorized sale and advertising of products is likely to cause confusion, cause mistake, or deceive an appreciable number of ordinarily prudent purchasers as to the affiliation, connection, association, sponsorship or approval of ARG products because it suggests that the products Defendants offer for sale originate from, or are sponsored, authorized, approved, or otherwise connected with ARG when, in fact, they are not.

231.    Defendants' unauthorized sale of products bearing ARG Registered Trademarks and unauthorized use of ARG Registered Trademarks in advertising infringes on the ARG Registered Trademarks.

232.    Defendants' unauthorized sale of products bearing ARG Registered Trademarks and unauthorized use of ARG Registered Trademarks in advertising has materially damaged the

value of the ARG Registered Trademarks and has caused significant damages to ARG's business relations.

233.    Defendants' unauthorized sale of products bearing the ARG Registered Trademarks, and unauthorized use of the ARG Registered Trademarks in advertising constitute unfair competition under Utah Code Ann. § 13-5a-102.

234.    As a result of Defendants' unlawful actions, ARG has suffered, and continues to suffer, irreparable harm.  ARG has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

235.    Pursuant to Utah Code Ann. § 13-5a-103(1), ARG is entitled to actual damages, punitive damages, and attorneys' fees and costs.

236.    ARG is also entitled to punitive damages because Defendants acted willfully and maliciously toward ARG or with knowing or reckless indifference toward, and disregard of, the rights of ARG.

**SIXTH CAUSE OF ACTION**
**Tortious Interference with Contractual Relations**

237.    ARG hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

238.    ARG has contracts and business relationships with its Authorized Sellers, who sell ARG products.  These contracts require ARG's Authorized Sellers to sell ARG products to end-user consumers through approved channels or resellers who meet certain requirements as dictated by ARG.  These contracts prohibit Authorized Sellers from selling ARG products to third parties, such as Defendants, who are not Authorized Sellers and who intend to resell the products.

239.    Defendants are not Authorized Sellers of ARG products.

4895-7526-4844.1

240.    Defendants have sold—and continue to sell—products bearing the ARG Registered Trademarks through their Amazon storefront.

241.    Based on these facts, it is plausible and a reasonable inference that Defendants acquired the products they are reselling from one or more of ARG's Authorized Sellers.

242.    Defendants knew since (at the latest) receiving ARG's August 2022 cease-and-desist letter that ARG had agreements with these Authorized Sellers that prohibited unauthorized online sales and sales to unauthorized resellers, and that Defendants would be tortiously interfering with those agreements if they continued to acquire products from Authorized Sellers for resale.

243.    Defendants, without legal right, privilege, or justification, intentionally, knowingly, and willfully interfered with the contracts and business relationships between ARG and its Authorized Sellers by purchasing products from Authorized Sellers for the purpose of reselling products on the Internet in violation of the Authorized Sellers' contracts with ARG, thereby causing Authorized Sellers to breach their contracts with ARG.

244.    In inducing ARG's Authorized Sellers to breach their contracts with ARG, Defendants acted with a wrongful purpose – specifically, to unlawfully infringe upon and materially damage the value of the ARG Trademarks by reselling the products they obtained from Authorized Sellers in violation of their contracts.

245.    Upon information and belief, Defendants interfered with ARG's contracts with its Authorized Sellers through wrongful means, namely concealing and failing to disclose their intention to resell the products even after being informed that this intention would mean that Authorized Sellers would be breaching their agreements with ARG by selling to Defendants.

246.    Because Defendants have refused to disclose how they have obtained the products bearing the ARG Registered Trademarks they have resold, ARG must take discovery in this action to learn the specific identities of the Authorized Sellers that sold products to Defendants. Defendants, however, know the sources of the ARG products they have obtained and the basis for ARG's claim of tortious interference.  ARG's agreements with its Authorized Sellers are a specific class of contract that Defendants caused Authorized Sellers to breach when they purchased products from Authorized Sellers for resale.

247.    Defendants' actions have caused injury to ARG for which ARG is entitled to compensatory damages in an amount to be proven at trial.

248.    The injury to ARG is immediate and irreparable, as ARG's reputation and relationships have been damaged among both its consumers and Authorized Sellers.

249.    ARG is also entitled to punitive damages because Defendants acted with actual malice and accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

## **PRAYER FOR RELIEF**

WHEREFORE, ARG prays for relief and judgment as follows:

A.    Judgment in favor of ARG and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, liquidated damages, restitution, including disgorgement of profits, and pre-judgment and post-judgment interest, as permitted by law;

B.    Preliminary and permanent injunctions enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any

and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

    i)    Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all products bearing the ARG Registered Trademarks;

    ii)    Prohibiting the Enjoined Parties from using any of the ARG Registered Trademarks in any manner, including advertising on the Internet;

    iii)    Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all products bearing any of the ARG Registered Trademarks;

    iv)    Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the ARG Registered Trademarks including invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

    v)    Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of ARG's products, or any of the ARG Registered Trademarks;

    vi)    Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google,

4895-7526-4844.1

Yahoo, and Bing), to remove from the Internet any of the ARG Registered Trademarks which associate ARG's products or the ARG Registered Trademarks with the Enjoined Parties or the Enjoined Parties' websites; and

vii)    Requiring the Enjoined Parties to take all action to remove the ARG Registered Trademarks from the Internet, including from the website www.amazon.com; and

viii)    Requiring the Enjoined Parties to destroy or return to ARG all products bearing the ARG Registered Trademarks in their possession, custody, or control.

C.    An award of attorneys' fees, costs, and expenses.

D.    Such other and further relief as the Court deems just, equitable and proper.

Dated this 23rd day of January 2023.

FOLEY & LARDNER LLP

By */s/ Monica S. Call*
    Monica S. Call (11361)

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, ARG demands a trial by jury on all issues so triable.

4895-7526-4844.1

Dated this 23rd day of January 2023

FOLEY & LARDNER LLP

By */s/ Monica S. Call*
      Monica S. Call (11361)